43.     One particularly large "study" conducted by Parke-Davis served as yet another vehicle to financially reward physicians for prescribing Neurontin. In 1995 and 1996, Parke-Davis conducted an enormous clinical trial known as STEPS. STEPS was a marketing tool designed to induce neurologists to prescribe Neurontin at far higher doses than indicated in the FDA approved labeling. In contrast to authentic clinical studies, which have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for more than 1,200 "investigators" to enroll only a few patients each. Thus, Parke-Davis could channel payments to physician "investigators." The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug.

44.     Physicians were paid for agreeing to participate in the STEPS study and for every patient they enrolled. At the conclusion of the study, Parke-Davis offered the 1,200 "investigators" additional cash for each patient the doctors kept on Neurontin after the study ended. These participating doctors were thus expressly paid for writing Neurontin prescriptions for their patients.

**D.   Parke-Davis' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

45.     Parke-Davis' marketing strategy used physicians (and Parke-Davis' medical liaisons) to perform the work normally performed by the company's sales force in order to promote Neurontin. Parke-Davis made tens of thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or prescribe

Neurontin themselves. A description of the various programs used to make these payments to physicians follows.

### (a)  Consultants Meetings

46.  Physicians were often recruited and paid by Parke-Davis to attend dinners or conferences where the physicians would be encouraged to prescribe Neurontin for non-medically necessary off-label uses. Parke-Davis had some doctors sign sham consulting agreements and attend the meetings as a paid consultant. These consultants were not required to provide any *bona fide* service in exchange for the money. The payments were solely intended to induce the physicians to prescribe Neurontin.

47.  A typical "consultants" meeting was held in Jupiter Beach, Florida for neurologists during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting skills, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast. Only persons who fell within this desirable demographic were invited.

48.  Qualifying physicians were given round-trip airfare to Florida (worth $800), two-nights accommodations (worth $340), free meals and entertainment, ground transportation and a "consultant's fee" of $250. The Jupiter Beach consultants meeting included two half days of presentations by Parke-Davis personnel relating to Neurontin, including extensive presentations relating to off-label uses. The presentations were made to appear as if sponsored

by an independent company, Proworx. However, all aspects of the presentations were designed, monitored, and approved by Parke-Davis. Its personnel selected the speakers, picked the topics and previewed the content of the presentations. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Parke-Davis provided each of its "consultants" with written abstracts of the presentations that detailed off-label use of Neurontin.

49.  No effort was made to obtain professional advice at Jupiter Beach from the "consultants" Parke-Davis had wined, dined, and entertained during the weekend. A follow-up memorandum to Parke-Davis' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference, Parke-Davis' personnel generated "trending worksheets" listing the doctors who attended the consultants meeting. These worksheets enabled Parke-Davis to track the Neurontin prescription-writing habits of the attendees before and after the consultants meetings to determine if these doctors wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was the sole purpose of the Jupiter Beach junket.

50.  The Jupiter Beach function was not unique. Parke-Davis hosted dozens of consultants meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label uses of Neurontin which were designed to change the physicians' prescription writing habits. Comparable consultants meetings included the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |

1825 / CMP / 00067010.WPD v1               21

| | | |
|---|---|---|
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Ranch Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Hundreds, if not thousands, of physicians received financial incentives to attend these events.

51.  Many consultants meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians for simply showing up. At none of the events did the consultants provide legitimate consultation to Parke-Davis, but at all of the events, the "consultants" were encouraged to increase their writing of prescriptions for Neurontin.

### (b) Medical Education Seminars

52. Another format through which Defendants paid financial incentives to physicians were programs billed as Continuing Medical Education ("CME") seminars. These conferences and seminars were set up to appear as "independent seminars" to qualify for an exception to the FDA's off-label marketing restrictions. Federal regulations, however, require that such seminars must be truly independent of the drug companies. For example, drug companies may make "unrestricted grants" to fund a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of off-label uses of Neurontin. While Parke-Davis retained third-party organizations, such as Proworx and MES, to present the seminars, Parke-Davis controlled virtually every aspect of these events, and the seminar companies obtained Parke-Davis' approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the seminar companies' fees.

53. For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently Parke-Davis' CME seminars were accredited by continuing medical education organizations. Thus the physicians taking advantage of Parke-Davis' seminars did not have to pay tuition or spend additional time to fulfill their continuing medical education requirements by attending truly independent medical education programs.

54. Representative CME programs sponsored by Parke-Davis where they paid extensive incentives to attending physicians, included the following:

| Seminar | Location | Date |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | September 19, 1997 |
| Merritt Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt Putnam Symposium | Boston, MA | December 5, 1997 |

(c)    **Grants and "Studies"**

55.    Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin advocates. Parke-Davis' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis.

56.    These grants, and others, were charged to Parke-Davis' Neurontin marketing budget. Each of these grants were made solely because the individual receiving the money was a large Neurontin supporter and/or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

57. Parke-Davis' medical liaisons informed leading Neurontin prescribers that significant advocacy for Neurontin would result in the payment of large study grants. These studies did not involve significant work for the physicians. Often times they required little more than the collation and write-up office notes or records. Indeed, Parke-Davis frequently hired technical writers to write the articles for which the "authors" had been given grants.

### (d)   Speakers Bureau

58. Parke-Davis also formed the Speakers Bureau as a subterfuge to pay kickbacks and gratuities to physicians for prescribing Neurontin, particularly for off-label uses. The Speakers Bureau sponsored teleconferences, dinner meetings, consultants meetings, educational seminars, and other events where the off-label uses of Neurontin were marketed. The speakers at these events were physicians who gave short presentations relating to Neurontin for which they were paid by Defendants anywhere from $250 to $3,000 per event. Many speakers received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments greatly exceeded the fair value of the work the physicians performed for Parke-Davis. Plaintiff believe that extensive payments through the Speakers Bureau took place at least from 1995 through 2000.

59. Parke-Davis' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speakers Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could be eligible to receive substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Parke-Davis' marketing personnel made it clear, however,

that the only way the doctors could receive the cash payments was to prescribe substantial amounts of Neurontin to their patients, preferably for off-label uses.

60.   Defendants were aware that these payments did not comply with the American Medical Association's guidelines for payments to physicians. They knew and intended that the payments were made for the express purpose of encouraging the physicians to prescribe Neurontin to their patients.

61.   In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices. As a result of that review, Parke-Davis determined that none of the programs described above complied with the federal requirements. Parke-Davis issued guidelines which essentially prohibited each of the programs described above. Nonetheless, Parke-Davis' payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued.

## VI.   CLASS ACTION ALLEGATIONS

62.   Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and on behalf of a class of third-party payors, which have paid all or part of the retail purchase price for Neurontin sold during the Class Period from January 1, 1994 through the present for medical conditions for which Neurontin was not medically safe and efficacious.

(a)   "Third-party payors" or "TPPs" refers to entities which are health insurers, health maintenance organizations ("HMOs") and other managed-care providers, other health care coverage collectives such as union health and welfare plans, and self-insured employers and their coverage plans.

(b) Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assigns and successors.

63. The Class is so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of members of the Class.

64. There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members within the meaning of Rule 23(a)(2) and 23(b)(3). Common questions of law and fact include the following:

(a) Whether Defendants engaged in a deceptive scheme of improperly marketing and selling Neurontin for conditions for which it is not safe or medically efficacious;

(b) Whether Defendants engaged in a deceptive scheme of improperly marketing and selling Neurontin to treat conditions for which the drug was not approved by the FDA;

(c) Whether Defendants violated FDA regulations concerning the promotion of off-label uses for Neurontin;

(d) Whether Defendants instructed or coached doctors on how to conceal the off-label nature of Neurontin on claim forms submitted to Plaintiff and members of the Class;

(e) Whether Defendants prepared, funded and published materials which contained false information and misrepresentations regarding off-label uses for Neurontin;

(f) Whether Defendants paid non-physician technical writers to write articles containing misinformation and misrepresentations concerning purported scientific evidence regarding the safety and medical efficacy of Neurontin to treat off-label conditions;

(g) Whether Defendants paid physicians to "author" articles written by others containing misinformation and misrepresentations concerning purported scientific evidence regarding uses of Neurontin for which it has not been scientifically proven to be safe or medically effective;

(h) Whether Defendants paid AMM and MES to market articles containing misinformation and misrepresentations concerning purported scientific evidence regarding off-label uses of Neurontin for which the drug is not safe or medically necessary;

(i) Whether Defendants are liable to Plaintiff and the Class for damages for conduct actionable under the various state consumer protection laws; and

(j) Whether Defendants have been unjustly enriched by their wrongful conduct.

65. The claims of the representative Plaintiff are typical of the claims of the members of the Class, as required by Rule 23(a)(3). The claims of Plaintiff and the members of the Class arise out of the same course of wrongful and deceptive conduct. They each paid for Neurontin to treat conditions for which the drug was not medically effective or safe and for which the drug was not FDA-approved.

66. Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience in prosecuting nationwide class actions. Plaintiff and its counsel are committed to vigorously

prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the Class.

67.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Plaintiff envisions no difficulty in the management of this lawsuit as a class action.

## VII. TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

68.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and members of the Class could not reasonably have discovered the fraudulent nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statutes of limitations.

### FIRST CLAIM FOR RELIEF

**Violations of the Consumer Protection Statutes of the 50 States, The District of Columbia and the Commonwealth of Puerto Rico**

69.     Plaintiff repeats and realleges each of the preceding paragraphs, as if fully set forth herein.

70. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in knowing violation of any and all state consumer protection statutes when Defendants knowingly and intentionally misrepresented the medical safety, efficacy and necessity of Neurontin to treat non-FDA approved uses and caused physicians to submit claims to Plaintiff and the Class misrepresenting or concealing the off-label uses for which Neurontin was being prescribed.

71. Defendants knew that the health insurance policies issued by Plaintiff and members of the Class covered Neurontin (a) only for FDA-approved uses or only for medically necessary uses. Defendants' unfair or deceptive acts or practices were specifically designed to induce Plaintiff and the Class to pay for Neurontin for off-label and non-medically necessary uses.

72. Defendants have violated the consumer protection statutes of the fifty states, the District of Columbia and the Commonwealth of Puerto Rico, as follows:

   (a) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code §8-19-1, *et seq.*;

   (b) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. §45.50.471, *et seq.*;

   (c) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §44-1522, *et seq.*;

   (d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §4-88-101, *et seq.*;

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq.*;

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. §6-1-105, *et seq.*;

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. §42-110b, *et seq.*;

(h)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code §2511, *et seq.*;

(i)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §28-3901, *et seq.*;

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201, *et seq.*;

(k)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §10-1-392, *et seq.*;

(l)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §480, *et seq.*;

(m)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §48-601, *et seq.*;

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §50511, *et seq.*;

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. §24-5-0.5.1, *et seq.*;

(p) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code §714.1 b, *et seq.*;

(q) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. §50-623, *et seq.*;

(r) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110, *et seq.*;

(s) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. §51:1401, *et seq.*;

(t) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §207, *et seq.*;

(u) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code §13-101, *et seq.*;

(v) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(w) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. §445.901, *et seq.*;

(x) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §325F.67, *et seq.*;

(y) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. §75-24-1, *et seq.*;

(z) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. §407.0 10, *et seq.*;

(aa) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code §30-14-101, *et seq.*;

(bb) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601, *et seq.*;

(cc) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903, *et seq.*;

(dd) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §358-A: 1, *et seq.*;

(ee) Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. §56:8-1, *et seq.*;

(ff) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1, *et seq.*;

(gg) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §349 *et seq.*;

(hh) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.*;

(ii) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §51-15-01, *et seq.*;

(jj) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. §1345.01, *et seq.*;

(kk) Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 §751, *et seq.*;

(ll) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605, *et seq.*;

(mm) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. §201-1, *et seq.*;

(nn) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. §6-13.1-1, *et seq.*;

(oo) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws §39-5-10, *et seq.*;

(pp) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws §37-24-1, *et seq.*;

(qq) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code §47-18-101, *et seq.*;

(rr) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code §17.4 1, *et seq.*;

(ss) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §13-11-1, *et seq.*;

(tt) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, §2451, *et seq.*;

(uu) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code §59.1-196, *et seq.*;

(vv) Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. §19.86.010, *et seq.*;

(ww)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §46A-6-101, *et seq.*;

(xx)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. §100.20, *et seq.*;

(yy)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. §40-12-100, *et seq.*; and

(zz)   Defendants have engaged in unfair competition or unfair or deceptive acts or practice in violation of 23 L.P.R.A. § 1001 *et seq.*, the applicable statute for the Commonwealth of Puerto Rico.

73.   As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and the Class have suffered damages in an amount to be proved at trial by paying for Neurontin to treat conditions for which the drug is not FDA approved and is not medically necessary.

## SECOND CLAIM FOR RELIEF

### Restitution/Disgorgement for Unjust Enrichment

74.   Plaintiff repeats and realleges each of the preceding paragraphs, as if fully set forth herein.

75.   Plaintiff and the members of the Class have conferred on Defendants' benefits in the form of payments for Neurontin that would not have been made had Defendants not engaged in the wrongful acts and practices alleged herein.

76. Retention of the payments and other benefits by Defendants would be inequitable and unjust in this case because Defendants' deceptive conduct caused Plaintiff and the members of the Class to pay for Neurontin when they otherwise would not have had to do so.

77. In fairness, under the equitable doctrine of unjust enrichment, Defendants should be required to disgorge to Plaintiff and the members of the Class the revenues or profits Defendants earned from their improper sales of Neurontin to Plaintiff members of the Class or their insureds.

## VIII. DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

(a) On Plaintiff's First Claim for Relief, an award to Plaintiff and the Class of the maximum damages allowable under such statutes;

(b) On Plaintiff's Second Claim for Relief, an award to Plaintiff and the Class of disgorgement of all sums improperly received by Defendants;

(c) An award of prejudgment interest in the maximum amount allowable by law;

(d) An award to Plaintiff of its costs and expenses in this litigation and reasonable attorneys' and expert fees and expenses; and

(e) An award to Plaintiff and the Class of such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: May 13, 2004

*/s/ Peter A. Pease*
Peter A. Pease BBO# 392880
Todd A. Seaver BBO# 645874
**BERMAN DEVALERIO PEASE
   TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA 02109
Telephone: 617-542-8300
Facsimile: 617-542-1194

-and-

**BERMAN DEVALERIO PEASE
   TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr.
425 California Street, Suite 2025
San Francisco, CA 94104-2205
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD
   & SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Jeanne F. D'Esposito, Esq.
The Gateway - 11th Floor
One North Lexington Avenue
White Plains, NY 10601-1714
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, Pa. 19103
Telephone: (215) 561-1011
Facsimile: (215) 561-0012